**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| ANNA WORSHAM, | : | Case No. 1:21-cv-331 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| ANTHEM INSURANCE | : | |
| COMPANIES, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

---

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on Defendants' joint Motion for Summary Judgment (Doc. 15). Plaintiff filed a response in opposition (Doc. 17), to which Defendants collectively replied (Doc. 18). For the reasons provided below, Defendants' motion is **GRANTED**.

### FACTS

I.      **Anthem Policies and Procedures**

Anthem Insurance Companies, Inc. ("Anthem") is a health insurance provider of, among other things, Medicare and Medicaid health insurance plans. (Chaney Dec., Doc. 15-1, Pg. ID 911.) Anthem's field sales and services representatives promote enrollment into Medicare and Medicaid plans. (*Id.*) Each sales representative is assigned a specific geographical location and is required to meet certain monthly enrollment or sales goals as set by the sales representative's Medicare manager. (*Id.*; Chaney Dep., Doc. 16, Pg. ID

724.) Failure to meet the sales goals may result in discipline. (Chaney Dec., Doc. 15-1, Pg. ID 911.)

All employees at Anthem "are responsible for knowing, understanding and complying with [Anthem] policies and applicable laws." (Anthem Shared Responsibilities Pamphlet, Doc. 13, Pg. ID 660.) Anthem's policies acknowledge the company's "commit[ment] to providing equal employment to individuals with disabilities as required by federal, state or local laws." (Equal Employment and Affirmative Action Policies, Doc. 13, Pg. ID 667.) Specifically, Anthem's policies state that the company "is committed to providing reasonable accommodations to enable [disabled] individuals to perform the essential functions of their job." (*Id*.) Anthem's policies additionally state that the company "strictly prohibits any acts of retaliation against associates who report or complain about discrimination or discriminatory harassment, or who participate in investigations of these complaints." (*Id*. at Pg. ID 672.)

Anthem has Family Medical Leave policies for all employees. (FMLA Policy, Doc. 13, Pg. ID 676.) The policy "applies to all associates who: (1) have been employed by Anthem for at least 12 months prior to the date the leave is to begin, [and] (2) have worked at least 1,250 hours of service . . . during the 12-month period immediately preceding the start of leave." (*Id*.) Such policy complies with the Family Medical Leave Act ("FMLA"), thereby allowing employees "to take up to 12 work weeks of job-related unpaid leave in a rolling 12-month period for certain family and medical reasons." (*Id*.) Anthem employees may take FMLA leave "due to a serious health condition that makes an [employee] unable to perform the essential functions of the job." (*Id*.) A serious health

2

condition is defined as "an illness, injury, impairment, or physical or mental condition involving either inpatient care or continuing treatment by a health care provider." (*Id*.)

Anthem employees must complete a "Request Leave of Absence" form on the employee website to request leave. (FMLA Leave Policy, Doc. 13, Pg. ID 677.) "Leave request[s] should be made within 30 calendar days before the start of leave when foreseen." (*Id*.) "Otherwise the request should be made within at least one or two business days after the associate becomes aware of the need for leave." (*Id*.)   Lastly, if an employee's requested FMLA leave is due to a serious health condition, "the amount of leave that may be taken depends on the documentation submitted by the treating healthcare provider and [the employee's] available [leave] balance." (*Id*.)

Anthem also provides all employees with its corrective action policy, which allows for verbal warnings, written warnings, or termination. (Corrective Action Policy, Doc. 13, Pg. ID 667.) However, the policy allows for any form of corrective action to be taken at any time or repeated, based on the individual's manager's discretion and consideration of the following factors: "individual circumstances, severity of the behavior, corrective action history, performance history, performance evaluations, and whether the behavior/conduct can be corrected." (*Id*.) Certain types of misconduct that may lead to corrective action includes "falsifying or making material omissions on company documents[.]" (*Id*.) Lastly, Anthem's corrective action policy states that "[t]ermination need not pertain to or be contingent upon the same or similar offense for which any prior documented [v]erbal counseling or [w]ritten warning was issued." (*Id.* at Pg. ID 669.) On the contrary, "[t]ermination may occur without any prior warning or counseling,

3

depending on the infraction or performance issue." (*Id.*)

## II.   Plaintiff's Employment with Anthem

Plaintiff Anna Worsham, an African American woman, was originally hired by Anthem in 2014 as a health plan provider. (Compl., Doc. 2, Pg. ID 35; Worsham Dep., Doc. 13, Pg. ID 430.) Then, in October of 2015, Plaintiff was interviewed by Defendant Anthony Chaney and promoted to field sales and service representative ("FSR") for the Medicaid central sales team. (Worsham Dep., Doc. 13, Pg. ID 436.) Plaintiff's territory was the Cincinnati and Portsmouth, Ohio geographical regions. (*Id.* at 441-42.) Plaintiff's direct supervisor during her tenure with Anthem was Chaney, the Manager of Medicare for Kentucky and Ohio. (Chaney Dep., Doc. 14, Pg. ID 720.) Chaney reported directly to Lora Beth Hull, who he identified as his "director." (*Id.* at Pg. ID 722.)

As an FSR, Plaintiff was required to meet monthly goals by "hold[ing] monthly events at some of [Anthem's] sales locations, mak[ing] phone calls and set[ting] appointments with potential individuals that were eligible for the Medicare plans that [Anthem] offered." (Worsham Dep., Doc. 13, Pg. ID 443; FSR Job Description, Doc. 13, Pg. ID 659.) These monthly events are either formal events or "grassroots" events, where an FSR attempts to get "consent to contract" with potential customers. (Chaney Dep., Doc. 14, Pg. ID 736.) Plaintiff held approximately fifteen grassroots events per year, where she would distribute materials that describe Anthem's Medicare and Medicaid plans, highlight the benefits of Anthem's plans, and seek enrollment from potential customers. (Worsham, Doc. 13, Pg. ID 445-446.) Plaintiff would then follow up with the potential customers that attended the grassroots events in a hope to have such customers enroll in

4

one of Anthem's plans. (*Id*. at 446-47.)

Sales representatives had different sales goals during the "lock-in period" and the annual enrollment period. (Chaney Dep., Doc. 14, Pg. ID 735.) An FSR's sale goals are higher during the annual enrollment period, which takes place between October 15th through December 7th of every year. (*Id*. at Pg. ID 735, 739.) FSR's monthly goals during the lock-in period are lower than during the annual enrollment period because most individuals are locked into their current Medicaid or Medicare plan and may only switch plans for limited reasons. (*Id*. at Pg. ID 739.)

The record is absent of evidence regarding whether Plaintiff received a performance evaluation in 2015 or 2016. However, she did receive performance evaluations in the years 2017 and 2018, each seemingly conducted by Chaney. (Chaney Dep., Doc. 14, Pg. ID 744.) Chaney determined that Plaintiff met Anthem's expectations in 2017 and 2018. (*Id*. at Pg. ID 746-47.) During her time at Anthem, Plaintiff only received two verbal warnings, once in 2017 and once in 2019, each due to not meeting her sales goals. (Chaney Dep., Doc. 14, Pg. ID 771, 800.)

### III.   Plaintiff's FMLA Leave

Plaintiff was diagnosed with polymyositis in 2010. (Worsham, Doc. 13, Pg. ID 421.) Polymyositis is an autoimmune disease which, as Plaintiff explains, "attacks your muscles." (*Id*. at Pg. ID 423.) Plaintiff's symptoms include muscle weakness, heart palpitations, balance problems, extreme fatigue, and extreme pain. (*Id*. at Pg. ID 423-24.) Plaintiff states that she always experiences the symptoms, but the severity of the symptoms vary. (*Id*. at Pg. ID 424.) Periods of severity may last anywhere from a few

5

weeks to a few months. (*Id.* at Pg. ID 425.)

Due to Plaintiff's autoimmune disease, she requested and was approved to take FMLA leave from November 26, 2018 through February 27, 2019. (FMLA Leave Approval, Doc. 13, Pg. ID 685-87.) Chaney was aware that Plaintiff was taking FMLA leave. (Chaney Dep., Doc. 14, Pg. ID 750.) Plaintiff was released to return to work on February 27, 2019, but was required by her primary care physician to limit her physical activity due to potential heart complications. (Worsham Dep., Doc. 13, Pg. ID 502.) Specifically, Plaintiff was limited to only 12 to 15 field, or grassroots, events per month for three months following her return. (*Id.*) Anthem approved this accommodation (*id.* at Pg. ID 508) and Chaney was aware of Plaintiff's need for such accommodation. (Chaney Dep., Doc. 14, Pg. ID 767.)

### IV. Plaintiff's Performance Following her Return from Leave, Complaints Alleged, and Subsequent Termination

Prior to taking FMLA leave, Plaintiff began lodging complaints to Chaney regarding other FSRs working her geographic regions, despite the fact that she was unable to work other regions. (Worsham Dep., Doc. 13, Pg. ID 458-59.) Plaintiff recalls multiple conversations with Chaney where she complained that other FSRs were working at her grassroots events. (*Id.* at Pg. ID 460-63.) Plaintiff had the ability to add events during the month if she elected to do so, but elected not to add additional events during the time period leading up to her FMLA leave. (Chaney Dep., Doc. 14, Pg. ID 788.)

Following her return, Plaintiff began complaining to Chaney again because Chaney had assigned events within Plaintiff's geographical regions to other FSRs.

(Worsham Dep., Doc. 13, Pg. ID 464-65.) Plaintiff's locations eventually became locations she shared with other FSRs. (*Id.* at Pg. ID 465.) According to Chaney, the sales events had been assigned to other FSRs while Plaintiff was still on leave. (Chaney Dep., Doc. 14, Pg. ID 786.) Plaintiff claims that she felt that the changes that occurred were due to her taking FMLA leave. (Worsham Dep., Doc. 13, Pg. ID 610.)

Then, on October 2, 2019, Plaintiff's sales incentive plan was changed. (Chaney Dep., Doc. 14, Pg. ID 784.) Plaintiff and Chaney met to discuss the change in her sales incentive plan on October 3, 2019. (*Id.* at Pg. ID 793.) Plaintiff yet again complained to Chaney about this because she viewed the change as "unfair" due to her being out earlier in the year on FMLA leave and because other FSRs continued working her locations following her return. (*Id.* at Pg. ID 784-85.) Chaney, however, had no authority to make changes to an FSR's sale incentive plan. (*Id.* at Pg. ID 790.)

On October 28, 2019, Plaintiff and Chaney had a phone call regarding Plaintiff's performance review for the annual enrollment period. (Chaney Dep., Doc. 14, Pg. ID 798; Worsham Dep., Doc. 13, Pg. ID 516-17.) At this time, Plaintiff was behind on her annual enrollment period sales. (Worsham Dep., Doc. 13, Pg. ID 518.) During this call, Chaney gave Plaintiff a verbal warning due to her poor performance. (October 28, 2019 Email, Doc. 13, Pg. ID 689-90.) He then required her to provide him with the names and phone numbers of each person she had enrolled at the end of each day. (*Id.* at Pg. ID 689.) He also required her to keep her calendar up to date. (*Id.* at Pg. ID 689.) He then informed her that she must: (1) attain 50% to sales goal by November 19, 2019, and (2) attain 100% of sales for January 1, 2020 effectives. (*Id.* at Pg. ID 690.) He lastly informed her that failure

to attain the metrics would result in a written warning. (*Id.*)

Following this conversation, on November 26, 2019, Plaintiff asked Chaney to cancel two grassroots events scheduled during the last week of the annual enrollment period on December 2nd and 3rd. (November 26, 2019 Email Chain, Doc. 13, Pg. ID 692.) Plaintiff claimed she would be rescheduling the events and was planning on working the "holiday Friday." (*Id.* at Pg. ID 691.) However, Plaintiff admitted she was actually not working the "holiday Friday," as she was in Georgia for Thanksgiving. (Worsham Dep., Doc. 13, Pg. ID 533-34.) Plaintiff additionally rented a vehicle during her trip on Anthem's business account for personal use and left her "fleet vehicle" in the rental agency's parking lot against Anthem policy. (*Id.* at 532, 534; Chaney Dep., Doc. 14, Pg. ID 825.)

Chaney became suspicious of Plaintiff, and decided to check on her activities and sales on December 2, 2019. (Chaney Dep., Doc. 14, Pg. ID 812-13.) Chaney therefore checked Plaintiff's calendar and decided to attend the three home appointments she had listed. (*Id.*) Plaintiff admitted to adding these home appointments to her calendar. (Worsham Dep., Doc. 13, Pg. ID 537-38.) However, Plaintiff never showed up to the appointments. (Chaney Dep., Doc. 14, Pg. ID 816-818.) None of the individuals that Plaintiff listed she would be meeting with were aware of any appointment scheduled. (*Id.*) In fact, one of the individuals had previously passed away, and his wife was not expecting a home appointment with Plaintiff. (*Id.* at Pg. ID 817.) Then, later that day, Plaintiff, unaware that Chaney attempted to attend the appointments, claimed that she did attend two of the appointments listed in her calendar. (*Id.* at Pg. ID 839-40.) Lastly, on December 3, 2019, Plaintiff informed Chaney that she left a voice message for "John

8

Wolf" during the day. (*Id.* at Pg. ID 840.) However, the number she called did not have a voicemail set up to leave messages. (*Id.* at Pg. ID 830.)

Chaney discussed these events with Plaintiff on December 4, 2019. (Chaney Dep., Doc. 14, Pg. ID 823-24.) Chaney then discussed with Anthem executives, including his direct supervisor Lora Beth Hull, the best course of action to take due to Plaintiff's misconduct. (*Id.* at Pg. ID 829.) Chaney was then given the "go ahead" to terminate Plaintiff. (*Id.*) Plaintiff was terminated on December 12, 2019 for "falsification of company records relating to business appointments on December 2nd and 3rd, where [Plaintiff] listed 2018 clients who [were] either unenrolled, deceased, or otherwise had no business necessity[.]" (Worsham Dep., Doc. 13, Pg. ID 572.)

## V.    Procedural History

Plaintiff notably never filed a charge of unlawful discrimination with the Ohio Civil Rights Commission nor the Equal Employment Opportunity Commission prior to bringing this action. (Worsham Dep., Doc. 14, Pg. ID 404.) Rather, Plaintiff filed this action on May 13, 2021, alleging the following claims: (1) racial discrimination in violation of Ohio law; (2) disability discrimination in violation of Ohio law; (3) gender discrimination in violation of Ohio law; (4) retaliation in violation of the American with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and Ohio law; and retaliation in violation of the Family Medical Leave Act ("FMLA"). (*See* Compl., Doc. 2.) The parties proceeded with discovery and, once discovery concluded, Defendants filed the Motion for Summary Judgment (Doc. 15) addressed herein.

## LAW

Courts must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the nonmovant must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009).

The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. V. Rising*, 477 F.3d 881, 886 (6th Cir. 2007). This requirement, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (*citing Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). "If a moving party fulfills its burden of demonstrating that no genuine issue of material fact exists, the nonmoving party, to receive a trial, must present some significant probative evidence creating a factual dispute." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005).

10

## ANALYSIS

First, Plaintiff raises multiple claims of discrimination under Ohio law. Race and gender discrimination claims brought pursuant to Ohio law are analyzed under the same framework as Title VII claims. *See Ohio Civ. Rights Comm. v. David Richard Ingram, D.C., Inc.*, 630 N.E.2d 669, 674 (Ohio 1994). Additionally, because "Ohio disability discrimination law parallels the [ADA] in relevant respects," this Court may "appl[y] the same analytical framework, using cases and regulations interpreting the ADA as guidance in [its] interpretation of Ohio Rev. Code § 4112.02." *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F.Appx. 507, 514 (6th Cir. 2015). Lastly, the *McDonnell Douglas* burden-shifting framework applies to each of Plaintiff's discrimination claims. *See Mitchell*, 964 F.2d at 582.

Next, Plaintiff brings a retaliation claim against Defendants pursuant to Title VII, the ADA, and Ohio law. Like discrimination claims, retaliation claims under Ohio law apply the same analytical framework as retaliation claims under Title VII and the ADA. *Allman v. Walmart, Inc.*, 967 F.3d 566, 571 (6th Cir. 2020). Courts similarly apply the *McDonnell Douglas* burden-shifting framework to retaliation claims such as Plaintiff's. *See Redlin v. Grosse Pointe Public School System*, 921 F.3d 599, 613 (6th Cir. 2019).

Lastly, Plaintiff claims that her termination constitutes FMLA retaliation. Under the FMLA, an employer is prohibited from taking adverse employment actions, such as termination, against an employee for taking FMLA leave. *Marshall v. The Rawlings Co.*, 854 F.3d 368, 376 (6th Cir. 2017). As with Plaintiff's other claims, the *McDonnell Douglas* burden-shifting framework applies to her FMLA retaliation claim. *See id.* at 381.

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden to prove a prima facie case of discrimination and retaliation. *Redlin,* 921 F.3d at 606. If the plaintiff satisfies her initial burden, the burden shifts to the defendant to show a legitimate, non-discriminatory and non-retaliatory reason for the adverse employment decision. *Id.* at 607. Lastly, if the defendant satisfies its burden, the plaintiff must prove by a preponderance of the evidence that the stated reasons were pretext. *Id.*

## I. Prima Facie Case

To establish a prima facie case of discrimination, Plaintiff has the burden of showing that: (1) she was a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class. *Mitchell,* 964 F.2d at 582. Here, Defendants do not contest, and therefore concede, that Plaintiff established a prima facie case for race, disability, and gender discrimination. And the Court agrees.

First, as an African American woman with Polymyositis, she is a member of a protected class for her race, gender, and disability. (Compl., Doc. 2, Pg. ID 35; Worsham Dep., Doc. 13, Pg. ID 422-23.) Second, she was terminated, thereby suffering an adverse employment decision. (Worsham Dep., Doc. 13, Pg. ID 566.) Third, Plaintiff was qualified for her position, as she had many years of experience in marketing and sales, including medical sales, prior to accepting the position with Anthem in 2014. (*Id.* at Pg. ID 418-21, 426-27.) Lastly, Plaintiff was replaced by a white male. (Chaney Dep., Doc. 14, Pg. ID 755-56.) The record does not indicate that the individual who replaced Plaintiff had a disability. Thus, Plaintiff was replaced by an individual who was not a member of the

protected classes in which she was a member.

Next, to establish a prima facie case of retaliation, Plaintiff must show: "(1) she engaged in activity protected by [Ohio law]; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or persuasive retaliatory harassment; and (4) there is a causal connection between the plaintiff's protected activity and the adverse employment action." *Carroll v. Ohio Dept. of Admin. Serv.*, 555 F.Appx. 512, 519 (6th Cir. 2014). Lastly, and similar to the above analysis, to establish a prima facie case for FMLA retaliation, Plaintiff must establish: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

Defendants argue that Plaintiff cannot establish her prima facie case for retaliation of FMLA retaliation. First, Defendants claim that Plaintiff cannot establish that she engaged in protected activity or that a causal connection exists before Plaintiff's protected activity and her termination. Next, Defendants argue that, due to the lack of temporal proximity between Plaintiff exercising her FMLA rights and her termination, Plaintiff cannot establish a causal connection between her protected FMLA activity and her termination. However, because Anthem satisfied its burden to produce a legitimate, nonretaliatory reason to terminate Plaintiff, the Court proceeds to pretext without

13

deciding whether Plaintiff established a prima facie case of retaliation or FMLA retaliation. *See Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, at *3 (6th Cir. 2023).

## II. Legitimate, Non-Discriminatory and Non-Retaliatory Reason

Defendant's burden to produce a legitimate, non-discriminatory and non-retaliatory reason for Plaintiff's termination "is merely one of production, not persuasion, and it does not involve a credibility assessment." *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014). "Violations of express company polices are legitimate, non-discriminatory reasons to take adverse employment action." *Schwendeman v. Marietta City Sch.*, 436 F.Supp.3d 1045, 1061 (S.D. Ohio 2020). Dishonesty also constitutes a legitimate, non-discriminatory reason for adverse employment action. *Id.* Both also constitute legitimate, non-retaliatory reasons for adverse employment action under the ADA, Title VII and the FMLA. *See Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 667 (6th Cir. 2020); *see also Joostberns v. United Parcel Serv., Inc.*, 166 F. Appx. 783, 794 (6th Cir. 2006).

Here, Plaintiff was dishonest on numerous occasions prior to her termination. First, she lied to Chaney, stating that she would be working on the Friday following Thanksgiving. (See November 26, 2019 Email Chain, Doc. 13, Pg. ID 692.) Plaintiff admitted during her deposition that this was a lie, as she was on vacation in Georgia on that day. (Worsham Dep., Doc. 13, Pg. ID 553-34.) Plaintiff also was dishonest regarding her whereabouts on December 2nd and 3rd. She claimed she would be attending in-home appointments, all listed on her calendar. (Chaney Dep., Doc. 14, Pg. ID 812-13.) When Chaney attended the appointments listed, Plaintiff never appeared. (*Id.* at Pg. ID 816-18.)

Plaintiff, unaware that Chaney was aware of her dishonesty, lied again, claiming she attended two of the three appointments listed on her calendar. (*Id.* at Pg. ID 839-40.) Such dishonesty alone is sufficient to establish a legitimate, non-discriminatory reason for her termination. However, Plaintiff additionally violated express company policy when she falsified her calendar to reflect that she was attending the in-home appointments. (Worsham Dep., Doc. 13, Pg. Id 537-38.)

Thus, Defendants have sufficiently articulated legitimate, non-discriminatory and non-retaliatory reasons for Plaintiff's termination, satisfying their burden.

### III. Pretext

In this case, because Defendants established a legitimate, nondiscriminatory reasons to terminate Plaintiff, the burden shifts back to Plaintiff to establish that such reasons were pretextual. *Redlin*, 921 F.3d at 607. Under each claim of relief, Plaintiff may establish pretext in the following three ways. *See Reynolds v. Chipotle Mexican Grill, Inc.*, 120 F.Supp.3d 704, 714 (S.D. Ohio 2015); *see also Briggs v. Univ. of Cincinnati,* 11 F.4th 498 (6th 2021); *Sybrant v. Home Depot, U.S.A., Inc.*, 560 F.3d 553 (6th Cir. 2009). Plaintiff may establish pretext by showing: (1) Defendants' stated reasons have no basis in fact, (2) the reasons given are not the actual reasons for termination, or (3) the reasons are insufficient to explain Plaintiff's termination. *Reynolds,* 120 F.Supp.3d at 714 (S.D. Ohio 2015). To overcome this final burden, Plaintiff "must produce sufficient evidence from which the jury could reasonably reject [Defendants'] explanation and infer that [Defendants] intentionally discriminated against her." *Powell-Pickett v. AK Steel Corp.*, 904 F.Supp.2d 767, 781 (S.D. Ohio 2012).

Plaintiff's argument for pretext solely revolves around the second theory: that Anthem's reasons for terminating Plaintiff did not actually motivate her termination. For Plaintiff to succeed under this theory, she "concedes the factual basis underlying [Anthem's] proffered explanation and further admits that such conduct could motivate dismissal." *Barker v. Paccar, Inc.*, No. 2:18-cv-338, 2019 WL 4040533, at *11 (S.D. Ohio Aug. 27, 2019). Plaintiff must then show "circumstances which tend to prove that an illegal motivation was more likely than that offered by [Anthem]." *Id.*

Plaintiff solely points to two circumstances that she argues "tend to prove that an illegal motivation was more likely than that offered by" Anthem. *Barker*, 2019 WL 4040533 at *11. First, Plaintiff claims that, if Chaney was actually motivated to terminate Plaintiff due to her dishonesty and falsifying records, he "would have followed the proper steps under [Anthem's] progressive discipline policy prior to terminating" Plaintiff. (Response in Opp., Doc. 1041.) The Court is unpersuaded.

While "[e]vidence that the progressive-discipline policy . . . was not uniformly applied is evidence of pretext," *Lamer v. Metaldyne Co. LLC*, 240 F. Appx. 22, 11 (6th Cir. 2007), Plaintiff is required to identify similarly situated employees "who received a more lenient reprimand despite engaging in substantially similar conduct." *See Goldblum*, 62 F.4th 244, at *6. And here, Plaintiff fails to do so. Additionally, Anthem was not bound to follow the progressive discipline outlined within the corrective action policy. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 897 (6th Cir. 2020). The policy expressly states that "[t]ermination may occur without any prior warning or counseling, depending on the infraction or performance issue." (Corrective Action Policy, Doc. 13, Pg. ID 667.) Thus,

16

even without following the progression outlined within the policy, Anthem was still acting within its discretion provided. And as such, no reasonable juror could find that the procedures used to terminate Plaintiff were pretextual. *See Miles*, 946 F.3d at 897.

Second, Plaintiff claims that, following her return from leave, Chaney began holding Plaintiff "to a higher standard" than other FSRs and was "micro-managing" her, despite the fact that she was allegedly not experiencing performance issues. (Response in Opp., Doc. 17, Pg. ID 1042). The Court disagrees with this contention. First, Plaintiff cites to no case law that would persuade the court that Chaney's alleged "micro-managing" creates a genuine issue of material fact of pretext. Second, when Chaney began having Plaintiff inform him daily of the sales she had made, Plaintiff herself admits that she was behind on her annual enrollment period sale goals. (Worsham Dep., Doc. 13, Pg. ID 518.) Lastly, as already explained, Plaintiff's conduct was in clear violation of numerous express policies, warranting termination.

Accordingly, the Court finds that Plaintiff failed to show a genuine issue of material fact as to whether Anthem's legitimate, non-discriminatory and non-retaliatory reasons for her termination were pretextual. Defendants are entitled to summary judgment on Plaintiff's discrimination claims as a matter of law.

## CONCLUSION

Based on the above analysis, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 15). Plaintiff's Complaint (Doc. 2) is **DISMISSED with prejudice**. Therefore, this case is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND